**Michael A. PALMER, Plaintiff,**

v.

**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, Kansas, et al., Defendants.**

**No. 98–2382–JWL.**

United States District Court, D. Kansas.

Sept. 15, 1999.

Sulaimon Adebayo Hassan, Hassan Law Firm, Chartered, Kansas City, KS, for Michael A Palmer, plaintiff.

Henry E. Couchman, Jr., Maurice J. Ryan, Kenneth J. Moore, City of Kansas City, Kansas–Legal Dept., Kansas City, KS, for defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Michael Palmer filed this civil rights action against defendants alleging unlawful arrest and use of excessive force in violation of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights. Additionally, plaintiff asserts common law claims for false arrest and imprisonment, battery, negligence, negligent supervision, and misuse of the criminal process. Presently before the court is defendants Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government"), Carol Marinovich, Joe Vaught, James Swafford, Rex Garner, Ron Miller, Vince Davenport, Gregory Burris, Jose Hernandez, Claude Harper, and Jerry Campbell's motion for partial summary judgment (doc. 37). For the reasons set forth below, defendants' motion is granted in part and denied in part. The court grants defendants' motion with respect to plaintiff's claims arising under federal law, but denies defendants' motion with respect to plaintiff's pendent state law claims for which defendants seek summary judgment. Plaintiff's state law claims are dismissed without prejudice.

## I. Facts

In the late spring of 1996, plaintiff entered into a one-year lease agreement with Daniel Shapiro, a commercial property owner, for the rental of building space in which plaintiff opened an arcade parlor known as "Palmer's Arcade." Plaintiff applied for, and received, the appropriate city licenses for the billiards tables and video games located inside his arcade. Mr. Palmer was advised by city officials that he was not permitted to sell alcoholic beverages of any kind on the arcade premises. Additionally, the city code provided that, as a licensed amusement arcade, plaintiff's business was subject to reasonable inspections by the police department.

At some point in mid-August 1996, Palmer's Arcade was placed under surveillance by the Kansas City, Kansas Police Department ("KCKPD"). Plaintiff admits that he refused KCKPD officers entry into his business on more than one occasion. In the evening hours of August 23, 1996, defendant Davenport, a KCKPD Vice and Narcotics Unit detective, sought and obtained a search warrant for Palmer's Arcade. According to Davenport, his purpose in securing the warrant was primarily to search for alcoholic beverages allegedly being consumed on the premises by minors. Shortly after midnight on August 24, 1996, KCKPD Officers Campbell, Burris, and Harper approached and identified themselves to plaintiff, who was standing outside of the arcade at that time. The officers indicated that the purpose of their visit was to execute a warrant to search the premises. The officers then directed plaintiff to unlock the front door to the arcade so that they could enter the building.

At this point, the stories of Mr. Palmer and Officers Campbell, Burris, and Harper diverge. According to plaintiff, immediately upon hearing the officers' request to gain entry into the arcade, he turned toward the building to unlock the front door of the arcade, but then turned back around to face the officers, and simply asked them to explain the reasons for which the warrant had been issued. Suddenly and without warning, plaintiff contends, defendant Davenport knocked the keys out of plaintiff's hand so forcefully that plaintiff's wrist was injured by the blow. As the keys were being knocked out of his hand, plaintiff claims, an unknown officer grabbed his ponytail, while defendant Burris placed plaintiff in a "choke hold," at which point plaintiff's gun was removed from his left hip. Defendant Harper then proceeded to handcuff plaintiff, and in doing so, plaintiff maintains, Harper placed the handcuffs on plaintiff's wrists so tightly that the cuffs cut into his skin, which, in

turn, left bruises and lacerations on plaintiff's wrists. After several requests from plaintiff to loosen the handcuffs were ignored by the attendant officers, one of the officers finally adjusted the handcuffs.

Defendants, on the other hand, relate a markedly different version of the events leading to plaintiff's arrest. According to defendants Campbell, Burris, and Davenport, after the officers identified themselves and announced that they had a search warrant and thus that they needed plaintiff to let them into the arcade, plaintiff began to walk toward the door, turned around, walked back to the officers, and asked them why they were there. At that point, defendants contend, Campbell repeated the reason for their visit, and plaintiff once again started toward the door, but then turned around a second time and began questioning the officers regarding the purpose of their presence at the arcade. According to defendants, plaintiff repeated this scenario three or four times. After plaintiff turned toward the front door for the third or fourth time, Burris and Davenport claim, plaintiff threw his keys into a grassy area next to the building. Campbell neither saw plaintiff throw his keys, nor where the keys landed; Campbell merely heard plaintiff's keys hit the ground. After hearing the keys fall to the ground and observing the gun on plaintiff's left hip, Campbell ordered Burris and Harper to arrest plaintiff, and to remove Mr. Palmer's weapon. Officer Burris applied a vascular neck restraint to plaintiff's neck while Officer Harper removed the gun from plaintiff's hip. Burris testified that plaintiff quickly submitted to the arrest shortly after he began to apply pressure to plaintiff's neck. Officer Harper then secured plaintiff's arms with handcuffs, thereby effecting plaintiff's arrest.

The parties agree that, once plaintiff was placed under arrest, the officers broke out the front plate glass window in order to gain access to the arcade.[1] Plaintiff claims that, while he was standing handcuffed observing the subsequent events, he heard defendant Davenport instruct Daniel Shapiro, his landlord, to shut the arcade down. Additionally, plaintiff contends that he heard defendant Mayor Carol Marinovich order plaintiff's place of business to be shut down. Defendant Marinovich denies making any such statement, and defendant Davenport claims that Mr. Shapiro volunteered to board up the window that had been broken by the police officers.

Following his August 24, 1996 arrest, Mr. Palmer was charged and convicted in municipal court of the offenses of resisting arrest and obstruction of justice. After his conviction in municipal court on both charges, plaintiff appealed to the Wyandotte County District Court. A jury found Mr. Palmer guilty on the obstruction of justice charge, but acquitted him on the charge of resisting arrest. The obstruction of justice conviction was affirmed by the Kansas Court of Appeals on January 29, 1999.

On October 6, 1997, over a year after the August 24, 1996 incident, a bench warrant for plaintiff's arrest was erroneously issued by a Kansas City, Kansas municipal court judge. On September 16, 1998, plaintiff was arrested on a County warrant for child abuse, an outstanding traffic warrant, and the erroneously-issued October 6, 1997 bench warrant. On September 22, 1998, plaintiff notified Municipal Court Judge Wes Griffin that the October 6, 1997 bench warrant was invalid. At that time, Judge Griffin acknowledged the error, and noted the inaccuracy on the court's docket sheet. The bench warrant was not purged

1. There is some debate between the parties as to what was found inside the arcade and the manner in which it arrived there. According to defendants, once inside the arcade, the officers found several open cans and bottles of beer and liquor, as well as marijuana. Plaintiff claims that any open alcoholic beverages allegedly found on the premises were planted by the police because no alcohol was being consumed by Mr. Palmer's guests inside the arcade. Although the parties' differing views as to how the alcoholic beverages came to be left in plain view of anyone entering the building suggests an issue of fact, a resolution of the dispute is immaterial to the issues presently before the court.

from the court's computer system, however, and on November 9, 1998, plaintiff was once again arrested on the outstanding October 6, 1997 bench warrant.

Plaintiff filed this action on August 24, 1998, alleging violations of 42 U.S.C. § 1981 for interfering with his ability to enjoy the benefits of his contract with Daniel Shapiro and closing down his arcade business because of his race, 42 U.S.C. § 1983 for excessive force and unlawful arrest in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments, as well as a common law claim for the filing of a false criminal complaint against plaintiff for resisting arrest on August 24, 1996. Plaintiff further asserts claims for unlawful arrest, battery, negligent supervision, and negligence in connection with the September 16, 1998 and November 9, 1998 arrests pursuant to an invalid warrant. Defendants move for summary judgment with respect to each of plaintiff's claims except those asserted against the Unified Government for false arrest and false imprisonment on September 16, 1998 and November 9, 1998.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. Id. at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; see *Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. Qualified Immunity and Fourth Amendment Claims[2]

 The qualified immunity doctrine shields government officials from personal liability under 42 U.S.C. § 1983 "unless

---

2. In his response to defendants' motion for summary judgment, plaintiff "concedes that

their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Baptiste v. JC Penney Co., Inc.*, 147 F.3d 1252, 1255 (10th Cir.1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where the defense of qualified immunity is raised, the first step in analyzing plaintiff's 42 U.S.C. § 1983 claim "is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all.") This is true because "[a] necessary concomitant to the determination of whether the constitutional right asserted by plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Accordingly, "[w]here a plaintiff fails to demonstrate that a defendant's conduct violated the law, [the court] need not reach the issue of whether the law was clearly established." *Barney v. Pulsipher*, 143 F.3d 1299, 1309 (10th Cir.1998); *accord Baptiste*, 147 F.3d at 1255 n. 6 ("In accord with *County of Sacramento v. Lewis*, ... this court first determines whether Ms. Baptiste has alleged a deprivation of a constitutional right. Only after determining that Ms Baptiste has alleged a deprivation of a constitutional right[ ] does this court ask whether the right allegedly violated was clearly established at the time of the conduct at issue.")

Plaintiff alleges that his August 24, 1996 arrest violated the Fourth Amendment be-

cause: (1) no probable cause existed to arrest him, (2) the force used to effect the arrest was excessive, and (3) the seizure of his gun during the course of his arrest and subsequent retention of the gun after the arrest was unreasonable. Defendants move for summary judgment with respect to plaintiff's Fourth Amendment claims, arguing that plaintiff has failed to establish that the actions about which plaintiff complains rise to the level of a constitutional violation. Alternatively, defendants contend that even if a Fourth Amendment violation occurred during the course of plaintiff's arrest, defendants Harper, Burris, and Campbell are nonetheless entitled to summary judgment on plaintiff's Fourth Amendment claims on the basis of qualified immunity.

■ The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Included in the protection afforded individuals under the Fourth Amendment is the right to be free from arrest without probable cause, *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), as well as from government officials' use of excessive force during the course of an arrest. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As explained in detail below, the court concludes that plaintiff's allegations fail to demonstrate that he suffered a constitutional deprivation at the hands of defendants. Accordingly, the court declines to address the second prong of defendants' qualified immunity defense, i.e., whether the constitutional rights alleged by plaintiff were "clearly established" at the time defendants acted. *See Pulsipher*, 143 F.3d at 1309.

there are insufficient facts to support [his Fourth Amendment] claims against defendants Marinovich, Vaught, Swafford, Garner, Miller, Davenport, and Hernandez." Pl. Mem. in Opp. at 12. Thus, in light of plaintiff's acquiescence to the court's entry of summary judgment with respect to his Fourth

Amendment claims in favor of the above-named defendants, *see id.*, the court grants summary judgment on plaintiff's Fourth Amendment claims against defendants Marinovich, Vaught, Swafford, Garner, Miller, Davenport, and Hernandez.

### 1. Unlawful Arrest

Mr. Palmer claims Officers Harper, Burris, and Campbell violated his Fourth Amendment right to be free from unreasonable seizures by arresting him without probable cause. Defendants move for summary judgment with respect to plaintiff's unlawful arrest on the ground that plaintiff's conviction on the obstruction charge conclusively establishes the existence of probable cause for his arrest.

Plaintiff's claim that his August 24, 1996 arrest was obtained without probable cause necessarily requires an analysis of the principles set forth in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In that case, the Supreme Court was faced with determining whether a state prisoner could challenge the constitutionality of his state court conviction in an action for monetary damages under 42 U.S.C. § 1983. *Id.* at 483–84, 114 S.Ct. 2364. Citing its belief that "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement," *id.* at 486, 114 S.Ct. 2364, the *Heck* court explained that

> in order to recover damages for [an] allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486–87, 114 S.Ct. 2364 (internal citation and footnote omitted). Illustrative of the type of "other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" is the following hypothetical:

> A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest.... He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, ... the § 1983 action will not lie.

*Id.* at 487 n. 6, 114 S.Ct. 2364.

Relying on the principles announced in *Heck*, the Tenth Circuit has recently held that, although plaintiff's state court conviction on a charge of resisting arrest did not foreclose his *excessive force* claim under § 1983, to the extent that the complaint challenged whether probable cause existed to arrest plaintiff for the underlying offense, any such allegation "must be stricken because any such finding ... would suggest the invalidity of [plaintiff's] state court conviction for resisting arrest." *Martinez v. City of Albuquerque*, 184 F.3d 1123, 1127 (10th Cir.1999). Thus, in reversing the district court's entry of summary judgment in favor of defendants on plaintiff's excessive force claim, the *Martinez* court explained that so long as plaintiff's underlying conviction remained intact, "the court must instruct the jury that [plaintiff's] conviction was lawful per se" because "[o]therwise, the jury might proceed on the incorrect assumption that the police officers had no probable cause to arrest [plaintiff], and thus reach a verdict inconsistent with [plaintiff's] criminal conviction." *Id.*

█ In his papers, plaintiff does not squarely address the substance of defendants' arguments with respect to whether his conviction on the obstruction charge conclusively establishes the existence of probable cause such that plaintiff is barred

from claiming that his arrest was unlawful. Instead, plaintiff states that "the dispute over the issue of probable cause is a material issue, rendering summary judgment inappropriate at this time." Pl.Mem. in Opp. at 13. This assertion appears to be based on plaintiff's belief that a dispute regarding the circumstances of his arrest somehow creates a material fact issue with respect to whether the officers had probable cause to arrest him. Thus, without acknowledging, disputing, or otherwise exploring whether *Heck* applies to the facts of this case, plaintiff merely sets forth the substance of the factual dispute regarding the circumstances of his arrest. To that end, plaintiff explains that whereas defendants claim that plaintiff's repeated questioning of their authority provided probable cause to arrest him for obstruction of official duties, plaintiff contends that his simple inquiry regarding the reason for the issuance of the warrant, an appropriate exercise of his First Amendment right to free speech, no less, could not possibly

provide the officers with probable cause to arrest him.

 Plaintiff's attempt to ignore defendants' arguments notwithstanding, the court concludes that, under the principles announced in *Heck* and *Martinez*, plaintiff's reference to the controverted facts regarding the circumstances of his arrest is insufficient to avoid summary judgment on his wrongful arrest claim. On the contrary, the court finds that because plaintiff's obstruction conviction is currently undisturbed, plaintiff is precluded from challenging the lawfulness of his arrest under 42 U.S.C. § 1983. *See Heck,* 512 U.S. at 485–87, 114 S.Ct. 2364; *Martinez,* 184 F.3d at 1127. Accordingly, defendants are entitled to summary judgment with respect to plaintiff's Fourth Amendment unlawful arrest claim.[3]

## 2. Excessive Force

That plaintiff is precluded from challenging whether probable cause existed to

---

**3.** The court further notes that, if the existence of probable cause were not conclusively established by plaintiff's state court conviction on the obstruction charge, a traditional "probable cause" analysis would yield the same result under the facts of this case.

"The constitutionality of a warrantless arrest [is analyzed] under the probable cause standard." *Romero v. Fay,* 45 F.3d 1472, 1476 (10th Cir.1995). A police officer may effect a warrantless arrest "if he has probable cause to believe that person committed a crime." *Id.* "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (quoting Jones v. City and County of Denver, 854 F.2d 1206, 1210 (10th Cir.1988)). When a warrantless arrest is challenged as violative of a § 1983 plaintiff's civil rights, "the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

Plaintiff does not controvert the assertion that "defendant Campbell had been informed that plaintiff would lock the front door and

stand out on the front porch and keep watch while other people were inside the business." Def.Mem.Supp.Summ.J. at 6. Nor does plaintiff dispute the fact that, when they first approached plaintiff on August 24, 1996, defendant Campbell identified himself and his accompanying officers as members of the KCKPD and informed plaintiff that the officers were there to execute a search warrant. *Id.* at 8. A fact issue exists, however, with respect to whether plaintiff inquired as to the reasons for the officers' search warrant only once, as plaintiff maintains, or several times, as the defendants contend. Taking plaintiff's version of the facts as true as the court must for purposes of summary judgment, the court concludes that a reasonable officer could have believed that plaintiff was attempting to obstruct justice by questioning the officers' authority at all, especially in light of their previous explanation that they were there to execute a warrant to search the premises and that they needed him to open the door. Indeed, if the officers were aware that plaintiff regularly stood guard outside the arcade, it would be reasonable for the officers to conclude that his questioning their presence was an intentional obstruction of the officers' attempt to execute the warrant for which plaintiff would be guilty of a violation under K.S.A. § 21–3808(a).

arrest him on August 24, 1996 does not bar plaintiff from claiming that the force used to effect his arrest was excessive and therefore unconstitutional.

In this case, plaintiff claims that "defendants used excessive force by knocking the keys out of plaintiff's hand, by grabbing his pony tail, by placing a choke hold on him, and by clamping the handcuffs on his hand [sic] so tight resulting in physical injury." Pl.Mem. in Opp. at 14–15. With respect to plaintiff's excessive force claims, defendants contend that summary judgment is appropriate because the force used to arrest plaintiff was neither unreasonable or excessive.

■ As stated above, the Fourth Amendment guarantees citizens the right to be free from the use of excessive force by government officials during the course of an individual's arrest. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In *Graham,* the Supreme Court held that all constitutional claims for excessive force "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." Id. "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397, 109 S.Ct. 1865. As noted by the Tenth Circuit, "[w]e judge the reasonableness of the force used not with the '20/20 vision of hindsight' or from the serenity of chambers but from the perspective of the officer on the scene, allowing for the split-second nature of most law enforcement decisions." *Pride v. Does,* 997 F.2d 712, 716–17 (10th Cir.1993) (citing *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865). In determining whether the force used was objectively reasonable, the court is to consider "the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resist-

ing arrest." *Wilson v. Meeks,* 52 F.3d 1547, 1553 (10th Cir.1995).

Applying the standards set forth above to the case at bar, the court concludes that the force used to effect plaintiff's August 24, 1996 arrest was objectively reasonable. As a preliminary matter, the court notes that plaintiff's assertion that excessive force was used when the keys were knocked out of his hand is somewhat confusing in light of the fact that, according to plaintiff, defendant Davenport was the officer who knocked plaintiff's keys away from him. As noted above, plaintiff has conceded that insufficient facts exist to support an excessive force against defendant Davenport. Thus, in light of this concession, the court concludes that to the extent that plaintiff's excessive force claim is predicated on the allegation that his keys were knocked out of his hand, summary judgment in favor of defendants is appropriate.

■ The court is thus left to resolve whether plaintiff's allegations of hair pulling, use of the vascular neck restraint (or "choke hold") technique, and the allegedly too-tight handcuffs constitute a claim for unconstitutionally excessive force. Whether taken together or analyzed separately, the court concludes that plaintiff's allegations fail to state a claim for excessive force under the Fourth Amendment. Indeed, taking as true plaintiff's version of the events, i.e., that he did not repeatedly question the officers but merely turned around once to inquire why the warrant had issued, defendant Burris' application of the vascular neck restraint technique was objectively reasonable under the circumstances.

It is uncontroverted that plaintiff was wearing a gun on the night of his arrest, and that, once Officer Campbell saw the gun, he advised defendants Harper and Burris to disarm the plaintiff. As set forth above, probable cause to arrest plaintiff existed, at least with respect to the obstructing charge. It was undoubtedly reasonable to disarm. plaintiff during the

course of his arrest. *See, e.g., Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.") In light of the fact that plaintiff has alleged no injury attributable to Burris' use of the vascular neck restraint, the court concludes that the choke-hold allegation is insufficient to satisfy plaintiff's burden on summary judgment to establish a claim for excessive force. Indeed, because plaintiff does not claim any injury arising from his placement in the choke hold, the application can hardly be characterized as "excessive." [4] *See, e.g., Pride,* 997 F.2d at 716–17 (where choke hold technique produced only minimal bruising "and no permanent injury whatsoever," officer's use of neck pressure technique characterized as "moderate force.")

Nor does the court believe that plaintiff has stated a claim for excessive force based on the allegation that one of the officers [5] pulled his ponytail. As with his complaint regarding Burris' use of the vascular neck restraint technique, plaintiff has not alleged, much less offered any facts to establish, that he suffered any injuries as a result of his hair being pulled. Furthermore, and the court notes, not surprisingly, plaintiff has not cited, and the court's research fails to reveal, any authority for the proposition that an officer's pulling on an arrestee's hair rises to the level of a constitutional violation.

Although somewhat more troubling, the court concludes that plaintiff's allegations regarding the manner in which he was handcuffed are likewise insufficient to establish a violation of his civil rights. Indeed, although plaintiff claims that Harper placed the handcuffs on him so tightly that his blood circulation was "cut off" and bruises were left on his wrists, the only evidence offered by plaintiff to support his allegation that he suffered injuries from the handcuffs is his own deposition testimony. In his deposition, plaintiff identified several exhibits as photographs of his wrists in which the lacerations allegedly caused by the handcuffs are, according to plaintiff's testimony, visible. [6] Plaintiff fur-

---

**4.** The court notes that plaintiff does not controvert defendants' assertion that, although a vascular neck restraint can cause the "victim" of the restraint to lose consciousness if applied forcefully and for a long period of time, plaintiff never lost consciousness as a result of Burris' use of the technique on him. Def.Mem.Supp.Summ.J. at 9. Indeed, plaintiff admits that, once defendant Burris began to apply the vascular neck restraint to plaintiff, plaintiff submitted to the arrest, and Burris then "backed off the technique." *Id.*

**5.** The court notes that, in his deposition, plaintiff was unable to identify which of the officers on the scene allegedly pulled his hair. Because plaintiff has assented to the entry of summary judgment on his Fourth Amendment claims with respect to all defendants except Officers Burris, Campbell, and Harper, if the officer who allegedly pulled plaintiff's ponytail was not one of these three officers, plaintiff's excessive force claim based on the alleged hair-pulling incident must fail. Because the court finds the alleged hair pulling insufficient to establish plaintiff's excessive force claim, however, the identity of the unknown hair-puller need not be resolved for the purposes of defendants' motion.

**6.** Plaintiff testified in his deposition as follows:

Q: ... And the lacerations were caused by what?

A: By the handcuffs.

. . . . .

Q: [I] show you Exhibit No. 10. Can you identify that photograph for me?

A: ... That's myself sitting in a chair and my wife taking a picture of my arms and stuff. And my hands

Q: When was that photograph taken?

A: I can't recall if it was the next day or the day after that.

q: Well, it says on the back of it September 10th, 1996. Is that when it was taken?

A: That's when I brought them to [my attorney].

Q: What does Exhibit No. 10 depict?

A: That's showing [my attorney] and anybody else whose [sic] looking at it the way my wrist is and everything. You can see the scars and all.

. . . . .

Q: Did you seek any medical attention for the injuries from the handcuffs?

ther testified in his deposition that the cuffs caused his wrists to bleed, and that his injuries necessitated a visit to a medical doctor. Despite these claims, however, plaintiff has not seen fit to provide the court with any evidence to substantiate his deposition testimony, such as the photographs to which he refers therein, or an affidavit or other documentation from the medical doctor from which he allegedly sought medical attention.[7] With nothing but a record conspicuously devoid of such corroborative evidence, the court views plaintiff's assertions regarding the extent of his injuries with a great deal of skepticism.

In the context of excessive force claims, the Tenth Circuit has held that "while loosening tight handcuffs may be the most compassionate action, the failure to do so does not rise to a clearly established constitutional violation." *Morreale v. City of Cripple Creek,* 113 F.3d 1246 (table), 1997 WL 290976, at *6 (quoting *Hannula v. City of Lakewood,* 907 F.2d 129, 132 (10th Cir.1990)); *see also Swanson v. Fields,* 13

F.3d 407 (table), 1993 WL 537708, at *6 (10th Cir. Dec. 20, 1993) (same). In *Hannula v. City of Lakewood,*[8] the plaintiff claimed that she sustained "nerve damage and possibly bone damage" as a result of the arresting officer's placement of tight handcuffs on her wrists. *Hannula,* 907 F.2d at 132. Plaintiff's allegations with respect. to the extent of her injuries notwithstanding, the court noted, "Hannula does not offer any supporting evidence for these statements. Indeed, Hannula offers no medical evidence of any type of injury." *Hannula,* 907 F.2d at 132 n. 3. Thus, it appears that the *Hannula* holding was premised, at least in part, on the lack of evidentiary support for plaintiff's injuries.[9]

In light of Tenth Circuit law governing excessive force claims, and given that plaintiff has failed to present the court with any evidence to substantiate his deposition testimony regarding the extent of his injuries, the court concludes that plaintiff has failed to meet his burden on summary judgment to establish that a consti-

Q: Which doctor did you see?

A: It's the doctor at—no, I didn't have K.U. Blue Cross–Blue Shield. I can't recall which doctor it was.

Q: Which day did you miss from work?

A: The day I was incarcerated and the day that I went to the doctor, the swelling. The day I swelled up.

Q: So you missed two days?

A: I can't recall how many days I missed.

7. The court further notes that, although plaintiff's arrest did not occur until August 24, 1996, plaintiff's deposition testimony indicates that on August 10, 1996 he presented to his attorney the photographs depicting the wrist injuries he allegedly sustained during his arrest. Because it is impossible to photograph injuries before they occur, the court is puzzled by this apparent inconsistency in plaintiff's deposition testimony; although it is certainly possible that the transcript is in error, or that plaintiff was mistaken when he testified as to the date of the photographs, plaintiff has made no attempt to resolve the discrepancy.

8. The court notes that, in the *Hannula* case, plaintiff's excessive force claim was analyzed under the due process standard because, at the time of plaintiff's arrest, "the Tenth Circuit generally examined claims of excessive use of force under a substantive due process standard." *Hannula,* 907 F.2d at 131. Although it is now clear that such claims are to be analyzed under the Fourth Amendment, *see Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the court does not believe that *Hannula*'s holding that, without more, allegations of too-tight handcuffs fail to state a constitutional violation would be altered in any significant way.

9. The court notes that the requirement of evidence to support a plaintiff's allegations of injuries resulting from a law enforcement's use of allegedly excessive force is not a novel concept in the Tenth Circuit. In that regard, the court notes that, albeit in the context of a Fifth Amendment claim, as opposed to a claim of excessive force arising under the Fourth Amendment, the Tenth Circuit has recently noted that "we have never upheld an excessive force claim *without some evidence of physical injury.*" *Bella v. Chamberlain,* 24 F.3d 1251, 1257 (10th Cir.), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (emphasis added).

tutional violation occurred during the course of his arrest. Accordingly, summary judgment in favor of defendants with respect to plaintiff's Fourth Amendment excessive force claim is granted.

### 3. Unreasonable Seizure and Retention of Plaintiff's Gun

■ Plaintiff maintains that because his "possession of the gun was lawful because it was duly licensed and registered," and because plaintiff did not attempt to use the gun in a "threatening manner towards [sic] the defendants," Pl.Mem. in Opp. at 16–17, the seizure of his gun during the course of his arrest violated his Fourth Amendment rights. As stated above, however, the court concludes that, under well-settled principles of search and seizure law, the seizure of plaintiff's gun during the course of his arrest was constitutional. *See, e.g., Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 487, 142 L.Ed.2d 492 (1998). In *Knowles,* the Supreme Court reiterated the "the two historical rationales for the 'search incident to arrest' exception: (1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Id.* (citing *United States v. Robinson,* 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) and *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). Both underlying rationales are present here, and plaintiff's arguments to the contrary are, quite simply, unavailing.

Plaintiff's arguments with respect to the retention of his gun, however, are not so easily dismissed. In that regard, plaintiff states that "[e]ven if we assume that the taking of the gun was reasonable when they arrested plaintiff, defendants have no justifiable reasons [sic] to retain the gun." Pl.Mem. in Opp. at 16. Defendants, on the other hand, argue that the retention of his gun was reasonable under state law, and that, in any event, the retention of plaintiff's gun does not rise to the level of a constitutional violation. The court agrees.

■ Pursuant to K.S.A. § 22–2512(1), "[p]roperty seized under a search warrant or validly seized without a warrant shall be safely kept by the officer seizing the same unless otherwise directed by the magistrate, and shall be so kept as long as necessary for the purpose of being produced as evidence on any trial." K.S.A. § 22–2512(1). Plaintiff claims that because he was not charged with a gun-related offense, and because his gun was not introduced at trial, defendants' retention of his gun was unconstitutional. Plaintiff further states that, despite his attempts to retrieve his gun, "[a]ll he gets [sic] is the run around." Pl.Mem. in Opp. at 17.[10] In their answer filed October 26, 1998, defendants stated that plaintiff's gun would be released to him upon his presentation of valid identification and weapons registration documentation to the police property room attendant. Even so, plaintiff did not attempt to retrieve his gun until March 22, 1999, five months after defendants' answer indicated it would be released.[11] Contrary to the statement that plaintiff need only present himself and appropriate documentation in order to reclaim his gun, however, upon his arrival to the police property room, plaintiff was told that his gun could not be released until written authorization from Unified Government's Legal Department was received. On March 26, 1999, counsel for defendants

---

10. In his papers, plaintiff states that he "called and visited Unified Government's police department property room several times in an effort to get his gun back." Pl.Mem. in Opp. at 17. Plaintiff refers the court to his deposition testimony as support for this assertion. A review of plaintiff's deposition testimony indicates only that plaintiff placed telephone calls to the police department, not that he personally visited the property facility.

11. Although non-dispositive of the issue, plaintiff's delay in attempting to retrieve his gun once given the proverbial "green light" for its release casts some doubt as to plaintiff's true need or desire to regain custody over his gun.

submitted the required authorization, and plaintiff's gun was eventually released to plaintiff on April 6, 1999.

Despite plaintiff's argument that defendants' retention of his gun amounted to a violation of his constitutional rights, plaintiff offers no authority for that assertion. The court acknowledges that plaintiff's gun remained in defendants' custody for a fairly lengthy period of time, and finds it unfortunate that plaintiff's telephone requests seeking the release of his gun were repeatedly rebuffed. The court further commiserates with plaintiff's understandable disappointment when, despite defendants' assertion that plaintiff's gun would be released upon presentation of the appropriate documentation, his March 22, 1999 request for the release of his gun was denied pending written authorization from defendants' counsel. Plaintiff's understandable dismay with the delayed return of his gun notwithstanding, the court fails to see how bureaucratic red tape and/or apparent administrative snafus resulted in a wrong of constitutional dimensions. Accordingly, summary judgment in favor of defendants with respect to plaintiff's Fourth Amendment claim for the allegedly unreasonable seizure and subsequent retention of his gun is granted.

### C. Claims Against Defendant Unified Government

In his response to defendants' motion for summary judgment, plaintiff fails to address any of defendants' arguments with respect to defendant Unified Government's entitlement to summary judgment on plaintiff's claims. The court therefore deems any claims asserted against defendant Unified Government abandoned. *See Wesley v. Don Stein Buick, Inc.,* 42 F.Supp.2d 1192, 1195 n. 2 (D.Kan.1999). Plaintiff's tacit abandonment of his § 1983 claims against defendant Unified Government notwithstanding, the court notes that, based on the record currently before it, it is unlikely that plaintiff's claims against the municipality would withstand summary judgment under the principles announced in *Monell v. Department of So-cial Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and its progeny.

■ In *Monell,* the Supreme Court established the now well-settled rule that local governments are only liable under 42 U.S.C. § 1983 for constitutional torts that amount to a custom or policy of the municipal entity. *Id.* More specifically, municipal liability in a § 1983 case will attach "only when the official policy is the 'moving force' behind the injury alleged." *Board of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Thus, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights." *Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1998).

■ In this case, the record is completely devoid of any evidence showing that a Unified Government policy was the "moving force" behind the constitutional deprivations alleged by plaintiff. Thus, in light of plaintiff's utter failure to address defendant Unified Government's municipal liability arguments, and because the record before the court fails to establish any facts from which a reasonable fact finder could infer that any of the constitutional violations alleged resulted from a municipal policy, summary judgment in favor of defendant Unified Government is granted with respect to each of plaintiff's § 1983 claims. *See Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1321 (10th Cir.1998).

### D. Eighth Amendment Claim

In his response to defendants' motion for summary judgment, plaintiff has failed to respond to defendants' arguments with regard to his claims allegedly arising under the Eighth Amendment. As noted earlier, the court deems plaintiff's failure to respond to an argument raised in defendants' papers tantamount to an express

abandonment of any such claim. *See Wesley v. Don Stein Buick, Inc.*, 42 F.Supp.2d 1192, 1195 n. 2 (D.Kan.1999).

 In any event, the court notes that, under the holding in *Graham v. Connor*, any claims for excessive force on the part of government officials during the course of an arrest are to be analyzed under the Fourth Amendment. *Graham*, 490 U.S. at 395 n. 10, 109 S.Ct. 1865. Indeed, it is well-settled that the Eighth Amendment governs alleged post-conviction constitutional violations asserted by inmates during the course of their incarceration. *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners ... where the deliberate use of force is challenged as excessive and unjustified.") Thus, in light of the fact that plaintiff has failed to address defendants' arguments with respect to his Eighth Amendment claim, and given that plaintiff's claims for alleged constitutional violations are inappropriately analyzed under the Eighth Amendment, the court grants summary judgment with respect to plaintiff's Eighth Amendment claims as well.

### E. Fifth Amendment Claim

In the pretrial order, plaintiff alleged that defendants' seizure and retention of his gun without just compensation constitutes an unconstitutional taking in violation of the Fifth Amendment. In his opposition to defendants' motion for summary judgment, however, plaintiff has not responded to defendants' arguments with respect to his Fifth Amendment claim. Accordingly, the court deems any such claim abandoned, and grants summary judgment in favor of defendants on plaintiff's Fifth Amendment claim.

The court further notes that plaintiff's taking claim is substantively untenable for a number of reasons, the two most obvious being that his gun has, in fact, been released to him, and that there are no facts indicating that defendants manifested an intention to permanently appropriate plaintiff's gun. *See, e.g., Porter v. United States*, 473 F.2d 1329, 1335–36 (5th Cir. 1973) (Government officials' "mere possession [of suspected assassin Lee Harvey Oswald's personal effects incident to a criminal investigation] does not *ipso facto* establish that there was an actual 'taking,' in the constitutional sense, for which compensation would be required.")

### F. Fourteenth Amendment Procedural Due Process Claims

#### 1. Seizure of Plaintiff's Gun

In his response to defendants' motion for summary judgment, plaintiff fails to address defendants' arguments with respect to whether the seizure of his gun constitutes a violation of the Fourteenth Amendment.

#### 2. Deprivation of Plaintiff's Contractual Rights

From what the court can discern from plaintiff's papers, it appears that plaintiff alleges that defendants Marinovich and Davenport, by their alleged orders to "shut down" his arcade business on the night of plaintiff's arrest, deprived him of procedural due process.[12] More specifically, plaintiff contends that defendant Davenport's alleged statement to plaintiff that "you will never operate another arcade in this City again, or any type of business like this," as well as an Judge Robert Serra's[13] alleged instruction to plaintiff

---

12. The first sentence of plaintiff's argument with respect to this issue states: "There is no dispute that plaintiff's allegation that defendants Marinovich and Davenport's order that plaintiff's arcade be shut down on August 24, 1996 deprived of [sic] interest in his arcade business, and denied him of [sic] contractual relationship with Daniel Shapiro and other

vendors are [sic] protected property interest." Pl.Mem. in Opp. at 18.

13. Judge Serra presided over plaintiff's arraignment in municipal court on the charges of resisting arrest and obstructing official duty. Def.Mem.Supp.Summ.J. at 8 n. 8.

that he "wasn't allowed in [his] business anymore" operated as a constructive revocation of his business license "as well as his contractual relationship on his lease and with the vendors." Pl.Mem. in Opp. at 18.

To determine "whether an individual was denied procedural due process, 'courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process.'" *Hatfield v. Board of County Comm'rs*, 52 F.3d 858, 862 (10th Cir.1995) (quoting *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir.1994)). Whether a protected property interest exists is determined by reference to state law. *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir.1996).

Although plaintiff apparently claims that the interest of which he was deprived was his interest in operating his arcade business, the court notes that plaintiff has not specifically so argued. Assuming *arguendo* that plaintiff has somehow adequately established a protected property interest in operating his business, the court concludes that defendants are entitled to summary judgment with respect to plaintiff's procedural due process claim.

In any event, defendants argue that the alleged statements by Marinovich and Davenport, if actionable at all, fall under the *Parratt/Hudson* doctrine. *See Parratt v. Taylor*, 451 U.S. 527, 539–41, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The *Parratt/Hudson* doctrine holds that, so long as an adequate postdeprivation remedy is in place, no procedural due process violation occurs where the alleged deprivation is attributable to unpredictable, random or unauthorized acts by state employees. *Zinermon v. Burch*, 494 U.S. 113, 128, 110 S.Ct. 975,

108 L.Ed.2d 100 (1990) ("*Parratt* and *Hudson* represent a special case ... in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide.")

The court concludes that, in light of the above standards governing procedural due process claims, plaintiff's allegations are insufficient to withstand summary judgment. Indeed, plaintiff does not dispute that he has never returned to the Palmer's Arcade premises, nor had any further contact with Daniel Shapiro, since his August 24, 1996 arrest. In fact, there is no indication from the record currently before the court that plaintiff's lease agreement with Mr. Shapiro was terminated or became otherwise unenforceable after plaintiff's arrest. Moreover, plaintiff admits, his video game and billiards tables licenses were not revoked or otherwise invalidated by any of the defendants to this action, but instead expired by their own terms. Plaintiff apparently relies on his allegation that his right to remain in business was constructively revoked by defendants' alleged comments regarding his ability to reopen the arcade. However, the court does not believe that, without more, these alleged comments could be reasonably interpreted to represent a revocation, constructive or otherwise, of plaintiff's right to operate his business. Plaintiff's conclusory allegations to the contrary notwithstanding, the court concludes that plaintiff has failed to come forward with specific facts from which a reasonable fact finder could infer that a constitutional deprivation of a protected property interest occurred. *See, e.g., Watson*, 75 F.3d at 578 ("As to plaintiff's allegations that defendants denied her due process with regard to her property right to her nursing license, she has not shown enough: [state licensing department] took no action to revoke or suspend her license.")

Furthermore, the court finds persuasive defendants' arguments with respect to the probable application of the

*Parratt/Hudson* doctrine to the facts of this case; arguments to which, the court notes, plaintiff has failed to specifically respond. With regard to that issue, the court notes that plaintiff does not controvert defendants' factual assertions that, if the statements plaintiff alleges deprived him of his interest in maintaining his business were in fact made, neither Marinovich nor Davenport had any authority to make them. Additionally, plaintiff does not challenge defendants' assertion that adequate post-deprivation remedies existed under state law. Thus, taking as true plaintiff's allegations regarding Marinovich's and Davenport's alleged orders to "shut down" plaintiff's business, any such directives could be characterized as the type of random, unauthorized acts of government officials against which the *Parratt/Hudson* doctrine constitutes a defense. In light of plaintiff's failure to refute defendants' contentions regarding the operation of the *Parratt/Hudson* doctrine as barring plaintiff's procedural due process claim, summary judgment is likely appropriate on this additional ground as well. Accordingly, the court concludes that plaintiff's procedural due process claim fails on a number of counts, and therefore grants summary judgment in favor of defendants with respect to plaintiff's Fourteenth Amendment procedural due process [14] claim.[15]

### G. Section 1981 Claims

██ Defendants Davenport and Marinovich move for summary judgment with respect to plaintiff's 42 U.S.C. § 1981 claims against them, claiming that plaintiff has failed to come forward with sufficient evidence demonstrating the existence of a material fact issue for trial with respect to

his § 1981 claim. More specifically, defendants argue that plaintiff has failed to offer sufficient evidence to establish a prima facie case of under § 1981. Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981. To establish a prima facie claim under § 1981, the plaintiff must present evidence with respect to the following elements: (1) plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993).

██ In this case, plaintiff alleges that defendants Marinovich and Davenport discriminated against him on the basis of race by harassing him, "shutting down" his business while allowing other similarly-situated caucasian businesses to remain operating, and otherwise interfering with his ability to enjoy the fruits of his rental contract with his landlord on the basis of his skin color. To that end, plaintiff boldly

14. In response to defendant's motion for summary judgment, plaintiff asserts what appears to be a substantive due process claim against defendants. Pl.Mem. in Opp. at 18. Because no substantive due process claim was preserved in the pretrial order or any subsequent amendment thereto, plaintiff's attempt to raise any such claim at this juncture is inappropriate.

15. The court notes that, although defendants have raised the defense of qualified immunity with respect to plaintiff's procedural due process claim, because the court concludes that plaintiff has failed to adequately allege a deprivation of a constitutional right, the court need not determine whether "the right allegedly violated was clearly established at the time of the conduct at issue." *Baptiste*, 147 F.3d at 1255 n. 6.

asserts that "Defendants Marinovich and Davenport did not dispute plaintiff's claims that they deliberately prevented him from enjoying the benefits of contractual [sic] relationship with Daniel Shapiro and other vendors because of his race." Pl.Mem. in Opp. at 19. To support this assertion, plaintiff states that "[t]he record shows that plaintiff is an African American, and both defendants are white" and that plaintiff "was harassed and prosecuted for not displaying licenses over his video games." *Id.* Plaintiff then claims that "[n]o such prosecution of white-owned business [sic] with similar circumstances" occurred, *id.*, but offers no specific facts to support that assertion. Plaintiff then relies on his own deposition testimony to support his contention that "plaintiff [sic] business was closed down, while a white-owned business known to have been used for trafficking drugs was not closed down." *Id.* Based on these allegedly undisputed facts, plaintiff claims, "a reasonable inference could be drawn that defendants [sic] actions were motivated by racial animus." *Id.*

As a preliminary matter, the court notes that plaintiff does not controvert defendants' assertion that the KCKPD has, on numerous occasions, recommended that legal action be taken to suspend the operations of several white-owned businesses suspected of engaging in illegal activities. Nor does plaintiff dispute the fact that the KCKPD has executed hundreds of search warrants issued with respect to white-owned businesses and/or residences. Nevertheless, plaintiff appears to believe that he was treated differently by defendants, and thus prevented from making and enforcing contracts on the basis of his race.

Turning to plaintiff's "evidence" of racial animus, the court first notes that the "white-owned business" to which plaintiff refers is, apparently, known as Miller Hardware. Plaintiff's deposition testimo-

ny regarding Miller Hardware is not based on his own personal knowledge; instead, plaintiff's knowledge of the Miller Hardware "drug-dealing" incident was derived solely from a newspaper article. Because plaintiff fails to provide any specific facts regarding the white-owned business, the differential treatment of which plaintiff bases his § 1981 claim, it is unclear whether Miller Hardware was in fact allowed to remain open for business following the drug "bust." More importantly, however, there is no evidence to support the proposition that any of the defendants in this case had any influence with regard to the manner in which the Miller Hardware case was handled, much less whether defendants Davenport or Marinovich were involved in the case at all. Thus, it is difficult to ascertain how a reasonable fact finder could infer racial animus from the allegedly disparate treatment between Miller Hardware and plaintiff's arcade, if the persons alleged to have treated him differently than the Caucasian Miller Hardware owners were not directly involved in both cases.

Furthermore, plaintiff does not dispute defendants' assertion that he never returned to the Palmer's Arcade premises to reopen the business, and that his video game and billiards table licenses were not revoked by city officials, but instead expired by their own terms on July 12, 1997. Given the fact that plaintiff does not controvert the assertion that he never attempted to reopen the business that was allegedly "shut down" by defendants because of his race, the court is hard-pressed to believe that he was prevented from enjoying the benefits of his contractual relationship at all, much less on the basis of his race. Thus, the court concludes that summary judgment in favor of defendants with respect to plaintiff's § 1981 claim is appropriate.[16]

16. Summary judgment with respect to plaintiff's § 1981 claim against defendant Unified Government is appropriate for substantially the same reasons underlying the court's entry of summary judgment in favor of defendant Unified Government with respect to plaintiff's

§ 1983. First, plaintiff has failed to address defendant Unified Government's arguments with respect to this issue in his response to defendants' motion for summary judgment, and the court therefore deems any such claim abandoned. Furthermore, a § 1981 plaintiff,

## H. September 16, 1998 and November 9, 1998 Arrests

As is the case with so many of plaintiff's original claims, plaintiff appears to have abandoned his § 1983 claims for the allegedly wrongful arrests that occurred on September 16, 1998 and November 9, 1998 by his failure to respond to defendants' arguments with respect to those claims. Summary judgment with respect to these claims is, therefore, appropriate.

His failure to address defendants' arguments specific to these claims notwithstanding, the court notes that plaintiff controverts defendants' factual assertions regarding the September 16, 1998 and November 9, 1998 arrests. Specifically, plaintiff states that

> Judge Sera, or Cook, or Hutton willfully, intentionally and deliberately issued a bench warrant for plaintiff's arrest on October 6, 1997 for alleged failure to appear for court hearing on the obstruction and resisting arrest charges, while in fact he has no reason or probable cause to believe plaintiff failed to appear for any of the scheduled hearing [sic] on these charges in the municipal or the district court.

Pl.Mem. in Opp. at 7. As support for this assertion, plaintiff refers the court to what appear to be municipal court records relating to Mr. Palmer. Evidently, plaintiff expects the court to draw an inference from the notations written by what appear to be several different people that because nothing in these documents specifically states that Mr. Palmer failed to appear for any scheduled hearing, then whichever of the three judges issued the bench warrant must have lacked probable cause to believe that he had so failed to appear for court.

Defendants admit that the October 6, 1997 bench warrant was erroneously is-sued by a Kansas City, Kansas municipal court judge. Defendants further admit that the warrant should have been canceled in the court's computer system once it was brought to Judge Griffin's attention, and that had it been so canceled, plaintiff's subsequent arrest on November 9, 1998 would not have occurred.

 The court concludes that while plaintiff became the victim of a rather unfortunate chain of events arising from the issuance of an erroneous bench warrant, and continued by an apparent glitch in the municipal court's computer docketing system, or human error on the part of Judge Griffin or his clerks, he has presented no evidence that would permit this set of circumstances to be actionable under 42 U.S.C. § 1983. The September 16, 1998 arrest was not solely due to the existence of the erroneous bench warrant; indeed, plaintiff was arrested at that time on the basis of two additional warrants: one for child abuse, and the other for an outstanding traffic warrant. Thus, the invalid warrant resulted in plaintiff's arrest on one more occasion than he otherwise would have been arrested. As a general rule, a single allegation of unconstitutional conduct is insufficient to establish municipal liability. *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir.1993) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* ... unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker"); *see also Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir.1995) (single incident of mistaken arrest insufficient to allege constitutional deprivation). Thus, the court concludes that

---

like a § 1983 plaintiff, must establish that a municipal policy or custom was the "moving force" behind the alleged § 1981 violation. *Jett v. Dallas Indep. Sch. Dist*, 491 U.S. 701, 735–36, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). As with plaintiff's § 1983 claim, the record before the court is devoid of any facts to support such an assertion. In light of

plaintiff's apparent abandonment of his § 1981 claims against defendant Unified Government, and in the absence of any facts tending to show that the alleged violation was caused by a municipal policy or custom, summary judgment in favor of defendant Unified Government with respect to plaintiff's § 1981 claim is granted.

plaintiff's allegations regarding the unlawfulness of his September 16, 1998 and November 11, 1998 arrests fail to establish a violation of his constitutional rights.

## I. Remaining State Law Claims

■ It is undisputed that no separate jurisdictional basis for plaintiff's common law claims exists in this case. Because the court finds defendants entitled to summary judgment with respect to each of plaintiff's claims arising under federal law, the court declines to exercise its discretion to address the merits of defendants' arguments regarding the propriety of summary judgment any of plaintiff's remaining state law claims.[17] *See* 28 U.S.C. § 1367(c)(3); *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir.1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."); *see also Pride v. Does*, 997 F.2d 712, 717 (10th Cir.1993) (in light of Tenth Circuit's affirmance of district court's dismissal of plaintiff's "jurisdictionally predicate" federal claims under § 1983, dismissal of plaintiff's pendent state law claims appropriate). Accordingly, all of plaintiff's state law claims are dismissed hereby without prejudice.

**IT IS THEREFORE BY THE COURT ORDERED THAT** defendants' motion for partial summary judgment (doc. 37) is granted in part and denied in part. Defendants' motion is granted with respect to each of plaintiff's claims arising under federal law. Defendants' motion is denied with respect to the state law claims for which defendants seek summary judgment. Plaintiff's state law claims are hereby dismissed without prejudice.

---

17. The court notes that, with the exception of plaintiff's state law claims for false arrest/imprisonment against defendant Unified Government, defendants move for summary judgment with respect to all of plaintiff's claims asserted in this action. This is why defendants' motion is captioned as one for "partial" summary judgment.